Will the counsel please step forward. Identify yourself and how much time you need. Good morning, Your Honors. Collin Dunn on behalf of the Plaintiff Appellant. I just ask to reserve three minutes for rebuttal. Garrett Boehm on behalf of Appellant.  Your Honors, before I get into the merits, I need to advise the court that on Monday of this week, I got a phone call from counsel for the appellees who believes that there's a jurisdictional issue, that there may be no jurisdiction in this court, the reason being that there was no 304A language entered. As you might recall, this was a trial against three defendants. One defendant, the University of Chicago, was essentially directed out for any direct liability. The second defendant received a jury verdict in its favor. And then the third defendant, there was a mistrial because of a deadlock. Judge Silganic declared a mistrial. That case is still pending before the circuit court. It's on the appellate state calendar. So this just happened Monday. I really haven't had a lot of time to look into the issue, and I'm certainly happy to file a supplemental brief if the court would desire it on the issue of jurisdiction. I think that would be advisable. Okay. Why don't we have the appellee go first since they raised it first. Okay. You. On that issue. Okay. You can continue your argument. Okay. But how much time would you want, Mr. Boehm? It depends upon the court. If we're going to discuss jurisdiction. Just jurisdiction. Only three minutes of discussion. No, I'm talking right. Unless you're prepared to address it now. I'm really not. So I thought you'd address it in writing. How much time do you need to file a brief? Seven days. Seven days. In seven days. Thank you. I apologize to the court for not picking that up earlier. As to the merits, there's three issues I'd like to talk about today. I know we've raised a number of issues. Obviously, we stand on those arguments in our brief. But the first issue is the residence issue, the 213 issue. So Judge Sulganik ruled that our experts were not permitted to criticize any of the residence conduct of the University of Chicago because nothing in the 213s, according to Judge Sulganik, identified any criticisms of those experts. His reading of 213 is way too strict. There's no case that he cited or that the defendants have cited that requires us to list every defendant's employee and identify specifically what each employee did wrong. What 213 requires is the subject matter of what the witness will testify to, the conclusions and opinions, and the basis for those opinions, the qualifications, and then the report, if there's any. If you think about in a different context, let's take a look, for instance, in a product liability case or in a construction negligence case, we sue Walsh Construction, and we say Walsh Construction was negligent because X, Y, and Z. We don't have to identify Walsh Construction's superintendent was negligent because he did this, its sub-foreman did this. We don't have to identify that in a 213 disclosure. We just say Walsh Construction, through its employees and agents, was negligent because. In a product liability case, same idea. When we're arguing negligent design, we don't have to say, you know, Cirrus negligently designed this component part of this aircraft because its head of engineering did X, Y, and Z. We just say Cirrus negligently designed the component part because it failed to have X, Y, and Z. So what cases support your position? Well, just the rule itself and the comment. The comment to the rule is the purpose of F3 is to prevent unfair surprise. How could the defendants in this case be surprised when, number one, if you look at their expert opinions, they say all University of Chicago physicians, employees, all University of Chicago doctors, nurses, and staff involved in labor and delivery complied with the standard of care. That wasn't their disclosure. But here, the difference is that doctors are not like those companies. This is an individual doctor, and there's lots of them that are doctors and nurses at the hospital. If you say all, that hospital has, I don't know, hundreds if not thousands of doctors. I know some of them are named. Some of them may not be named. There may have been a doctor who walked in and walked out.  And you're saying that that person would be included? I mean, the standard of care as to the specific defendant. And here, by using those broad words, if there was something about some individual resident or obstetrician or doctor other than the two named doctors, why didn't they just name them? They knew who they were. But he did name them. But they didn't alert the defendants that they would be, again, they used a broader term. Maybe the most broadest term possible. They didn't give it any specificity. What I just read was from their expert disclosure. And then, again, it says everybody. And if you look at their disclosure for the residents, their position is, we didn't know you were going to criticize our residents. Look at their disclosure for the residents. The residents' disclosure says, we complied with the standard of care in all respects. Then in the disclosure, they talk about the decision to give Pitocin did not violate the standard of care. I mean, they don't have the burden. You have the burden. No, but the point on 213 is, were they unfairly surprised by the opinions? And that's the standard. And unless they can show that, Judge Soganic should not have barred any of the criticisms of those residents. The names of the different residents that attended the mom and the different doctors that attended the mom and the different nurses that attended the mom, those are all in the hospital records, right? They're in the records. So it wasn't like you were picking doctors and residents and nurses out of a hat. You had the records and you had the names and you were referring to the records. From the parts of discovery deposition that are in the record, we can see that the experts were talking about the documents that the hospital created with the hospital's own employees' names on them. Correct. So it's not like some mystery people that you're talking about. You're talking about the people that the hospital knows were there. The hospital knows that they were there. And if you look at the 213 disclosures of our experts, they're littered with references to the residents. I mean, I went through and I was going to tell the court Dr. Lee mentioned X number of times. I stopped counting because there are so many references in the 213 disclosures to the different residents with specific allegations and arguments of negligence. I mean, for instance, on page 842 of our appendix, we talk about Pitocin. And it was Dr. Formio that ordered the Pitocin. Linda had a premature rupture of membranes. Her labor should have been delayed if Pitocin was negligently ordered and administered. I mean, that's a clear criticism of Dr. Formio. And the experts specifically said that Pitocin should not have been ordered if the membrane was ruptured. Correct. And they knew there's a note in the record that the membrane had been ruptured, and then the Pitocin was ordered. Correct.  Our expert gives a specific criticism as to a specific action by a specific resident in the disclosure. And so, you know, why does this matter? It matters because, number one, on the informed consent issue, the residents were the ones that were attempting to obtain informed consent throughout. I mean, they were the ones that really had the most contact with the patient. So by removing the residents from the case, you're essentially removing the informed consent argument, because the jury would have heard that the residents were the ones that were informing her of the risks in attempting to obtain informed consent. And at the end of the day, the residents were the ones that were delivering the baby. It was Dr. Martin, the resident, who was involved in the actual delivery. So any criticisms that we would have had as to the delivery by Dr. Martin was removed from the case, even though, again, in our disclosure, there's a specific criticism as to the manner in which Dr. Martin performed that delivery. And that's on page 846 of the appendix. You also specifically criticized the administration of betamethasone after the Pitocin, when it should have been done before the Pitocin? If you look at the discovery depositions of our experts, which they rely upon, and the trial testimony agree, it makes no sense to give the steroid after you give Pitocin. Pitocin accelerates the labor. The steroid is meant to strengthen the baby, and you're supposed to delay the labor and give it effect. So what they did here by essentially flip-flopping the two drugs made no sense whatsoever. So, again, you know, it's a big deal to have removed the residents from the case, because that was essentially the case as to the University of Chicago on the informed consent theory. Because, again, they were the ones that were involved in trying to obtain that consent. And so no case supports Judge Zolchanek's reading of 213. If you look at the comments to it, you know, whether there's unfair surprise, it's the whole purpose. The experts just to give the gist of the testimony. That's in the comments, the committee comments. And unless they can claim unfair surprise, which they can't on this record, there's no basis for removing the residents from the case. The second issue is the Ritadrine issue. That's the drug that would have been administered or should have been administered to delay the labor. So, you know, our theory of the case essentially was once she presents at the University of Chicago, you either do an immediate C-section, you know, and we think they should have done that. If you're not going to do that, what you should have done is delayed this labor as long as possible, administer the steroids, give this baby every chance to survive outside the womb. And the Pitocin, obviously, is not part of that process. It's the exact opposite of that process. Right. The Pitocin, what the Pitocin told us is that the doctors believe this baby was not going to survive. And let's get the baby out. And, you know, certainly that was not discussed with the plaintiff that this isn't going to happen. And, you know, the conduct is just inconsistent. The conduct of the doctors here, if you're going to give Pitocin, you don't give steroids. Now, when she first presented, she wouldn't have needed a crash C-section, but by the time all this medication was going through, there was a point at which the fetal heart rate was down to 60, and at that point she should have had a crash C-section. What does the record show the hospital told her at that point? Well, about at 215 you're talking about, so when the fetal distress occurs the first time. I don't think I'd have to. I just couldn't find anything in the record where somebody said, look, this baby's heart rate is 60. I know you don't. At this point, you wanted a C-section. Then you said, no, you didn't want a C-section, but this is our only choice right now. I can't find that in the record. Did anybody tell you that? No, I don't believe that's correct. I'll find out for rebuttal if I'm wrong on that. But I think the key here is that you're right. Nobody told her a C-section should happen at this point, at the 215 mark, when there's fetal distress, and that's what our doctor said should have happened. You should have done a crash C-section. It could have been done. The facilities, that's why she was transferred to the University of Chicago. And that would have avoided the head entrapment. Right. The issue with the ritidrine, though, you know, they rely heavily upon our experts' discovery depositions, but, you know, it's clear in their disclosures that they believe that the ritidrine should have been provided, that the steroids should have been provided. The testimony in the discovery depositions, you know, we think is not clear, but to the extent they believe that it's inconsistent, that should have been something that should have been presented to the jury. Let them decide. That's what juries are for. You don't take it away from them. So we – and what the prejudice for removing the ritidrine is that it kind of makes the steroid argument irrelevant because what's the purpose of the steroids if we're not going to delay the labor? So the jury would have been confused at that point. The last issue, Judge, that I'd like to talk about is the steroid issue. Judge Sulganik refused to instruct the jury on the provision of steroids, and, you know, it's a very low standard to warrant an instruction if there's any evidence. And both Dr. Dubrow and Dr. Shiffrin are experts, talk about the fact that in their disclosures they say not giving the steroids was a deviation of the standard of care and that that was an approximate cause of the baby's injury, specifically the respiratory distress syndrome. And that even Dr. Fishman agreed that had those steroids been administered and the labor delayed 24 hours, it potentially could have decreased her problems. That's a quote from her own testimony. Did Dr. Shiffrin or Dr. Dubrow testify regarding causation? They only testified on the deviation from the standard of care. No, they did. Not to give the steroids. No, they did. Did what? They did provide testimony that it would have benefited her specifically with the respiratory distress syndrome had they been provided. They both testified to that. Characterizing them as a standard of care expert is something that the defendants have done, but in their disclosures they certainly talk about approximate cause and they were prepared to do so, and they did do so in their testimony. And, you know, for instance, Dr. Shiffrin, this is on page 2051 of the record, is asked, did the failure of Dr. Fishman to provide steroids result in this child not getting adequate steroids prior to her birth? Yes. And therefore, did it result in the child not receiving the benefits of those steroids had they been given? The answer is surely yes. Okay, that is enough evidence to give the jury an instruction on was this approximate cause of her injury. It's a very low standard to warrant the instruction. And we think based upon Dr. Shiffrin's testimony, Dr. DuBose's testimony, and Dr. Fishman's admission that that should have been enough to get it to the jury. Unless there's any other questions.  Thank you very much. Thank you, Judge. Thank you. May it please the Court, Counsel. This is the second time this case has been on appeal before this Court. The first time was in 2008. There was a summary judgment that was awarded in favor of Dr. Chen. Justice Neville, of course, you were on that panel. And in that appeal, there was an issue with regard to the Rule 213 disclosures and whether or not they included opinions that were adverse as to Dr. Chen. This Court determined that no, those disclosures were insufficient. So clearly, the plaintiff knew the importance of having good Rule 213 disclosures. So this case moves along. And it's 2011. Now we're going to trial as to the remaining defendants in the case. And the defendants bring a motion to eliminate with regard to the residents. And the trial court looks at the disclosures and determines that, indeed, there are no disclosures there that are adverse specifically as to the residents. Are the residents discussed in that very lengthy disclosure? Certainly, they're discussed. Is there ever an opinion given by Dr. DeBow indicating that the residents deviated from the standard of care? And the answer to that question is no. Now, why is that important? Well, Dr. DeBow, in that very lengthy 17-page, I believe, disclosure, certainly knew how to refer to physicians, knew how to refer to the residents, knew how to refer to the nurses. And he specifically reviewed all the depositions of the residents, Dr. Borromeo, Dr. Lee, Dr. Martin. So he plainly knew who these people were. But isn't the question of surprise? Counsel says, how could you be surprised when, throughout, there's discussion at the discovery depths about the residents? Within the discovery depositions, certainly Dr. DeBow was asked, you know, are these the extent of your opinions in this case? And he answered yes. I'm asking, well, within those depositions, did he ever indicate that he had specific opinions adverse to the residents as having deviated from the standard? Didn't answer the question, but did he discuss the residents? Did he discuss them? Certainly, he did. But I think it required a certain level of specificity, which he was certainly capable of doing. Why? If you're not, unless you've done it, you're not going to be surprised. Why should you be surprised that in the disclosure, it says University of Chicago Physicians, University of Chicago Hospital Physicians. Why would there be any surprise? What's the difference between that and having a specific name? Why do you need a specific name? Well, I believe as the trial court looked at it, as the trial court concluded, Judge Sloganek said, it's got to be what the specific residents did that were deviations from the standard of care. The defense is entitled to know specifically whose conduct they're defending. And that was really the question, you know, what conduct is the hospital defending? As those disclosures revealed, the conduct it was defending was as to Dr. Fishman and as to Dr. Velitis. But there wasn't that specific disclosure as to the residents. Now, certainly, did the hospital provide a supplemental disclosures that included a defense as to all the residents? Well, certainly, that was the belt and suspenders approach here. If it hadn't and the expert opinions were allowed as to the residents, the hospital would have been in a very tough position. So you weren't surprised? We were surprised. Let me just ask you something else. I'll just start with that. I asked the same question before. You had, you controlled, you made the hospital records. So everything that happened in the care and treatment of this mom and baby, you knew who was doing what just from your own records. So how was there any surprise about any of that to begin with since they were your records? There was no surprise about the records. The surprise was what was the theory of the plaintiff's case? Well, once they got to this, to Dr. Defoe's deposition, he was talking about the behavior, the actions that were taken, and you knew who had taken which actions. You, for example, knew who ordered the Pitocin and when. Is that a correct statement? That's a correct statement. And you knew when the baby's fetal heart rate went down to 60. It was in your records. Is that correct? That's correct. And that was something that he criticized? That he criticized. I mean, he certainly noted it, yes. Right. So I guess I'm with my colleague. I'm trying to figure out what you were surprised about. What was the surprise? The surprise wasn't really an element of the trial court's approach to this question. I was really saying that defendants are entitled to specific disclosures so they know how to defend the case, which I think is correct. But you did know how to defend the case because you defended it. You clearly did know how to defend the case. You filed a defense. Our defense was focused upon defending the conduct of Dr. Fishman, Dr. Valaitis, the nurses at issue, but the focus was not upon the defense of the residents because the disclosures were insufficient in that regard. Well, that's the question. That's the question. Are you saying that the law should be that unless you specifically name the individual, then there's no? Well, the trial court looked at that question and considered it and said, well, if this was a situation where, you know, maybe there was only one resident at issue, my determination might be different. But here we've got lots of residents. You knew who they were. You could have, plaintiff, you could have disclosed exactly, you know, who you were critical of. I mean, there's Dr. Borromeo, there's Dr. Lee, there's Dr. Martin, and there's a fourth resident who I'm forgetting. Four or five. Yeah. That's not hundreds. It's not hundreds. But just because we know their names, they're throughout the documents, they're throughout the disclosures and the discovery depositions. Again, what about the analogy to the other types of cases that Mr. Dunn had referred to? Well, that's certainly new theory of how to approach this issue. But I would say that this is not a products viability case. It's not a construction case. It's a medical malpractice case. And within medical malpractice cases, there is a duty for the plaintiff to provide a case to a sufficient degree of medical certainty that there was a deviation from the standard of care. And without that disclosure, without that deposition testimony provided by Dr. Deboe, they haven't hit that standard. They haven't hit that bar. Now, Plaintiff's Counsel was certainly at that deposition of Dr. Deboe. She could have asked the follow-up questions and brought out sufficient opinions if he had them, if he held them at that time. But she didn't. And Plaintiff's Counsel indicates that, you know, why is this important? It's important for informed consent purposes. Well, what came out at trial? On the informed consent issue, their theory was the improper informed consent, Linda Logesty indicated that she was told by Dr. Fishman, and Dr. Fishman specifically, could not name any resident, for instance, or identify any resident that she was spoken to by with regard to informed consent, but that Dr. Fishman told her that she was infected, that her child was likely to die, that if she had a C-section, she also could die, and that she needed to be thinking about her three kids at home. The jury heard that testimony, and the jury determined that there was not improper informed consent after hearing all the evidence in the case, after hearing Dr. Deboe's testimony on the issue. Well, they didn't hear all the evidence in this case because part of the evidence in this case would have been the sequence of medication that was being criticized. The criticism of the sequence of the medication. Isn't that a correct statement? I don't believe so. Part of that was excluded. I don't believe so, Your Honor. I mean, there was certainly, if you're with regard to, I'm not sure what you're speaking to, because I don't think that's true. Well, they don't, the jury never heard what the residents were doing. Well, the criticism of what the residents were doing. The jury certainly heard what the residents were doing. But they never heard what the criticism of that was. Is that fair? No, I don't think that's fair either, because the basis for the informed consent criticism was based on what Linda Lagusti recollected she was told. There wasn't any other evidence on that. And her recollection was that Dr. Fishman told me that my child was going to die, that I was infected, that if I had a C-section, I was likely to die. And that testimony was rebutted by Dr. Fishman, who said I never would have said that, and my custom and practice was not at all in keeping with that, and here's what I would have told her. And the jury heard that information and determined that there was no liability for informed consent as to Dr. Fishman. Would it have been any different if the residents were still in the case? I submit no, because Linda Lagusti couldn't provide any testimony as to what a resident may or may not have said. With regard to the question as to steroids and the administration of steroids and tocolytics, that all goes back to when the bag of waters was leaking. The evidence in the case is uncontradicted that when Linda Lagusti was at Ingalls Hospital, her bag of waters was leaking at that time according to the ferronitrazine tests. That was reconfirmed upon her admission at the University of Chicago hospitals. The standard of care at the time in the presence of a leaking bag of waters did not require the administration of tocolytics or steroids. That's pretty much the bottom line on those two questions. Let's see if there's any more. Counsel brought up a question with regard to whether or not there was any causation testimony provided by Dr. Shiffrin and Dr. DeBell. Defendants submit that, in fact, there was not. And as the trial court observed, the only causation testimony in the case was that of Dr. Gabriel. What did Dr. Gabriel say? Dr. Gabriel – Well, page 2051 of the record is what he responded to when he read one of the questions. He said it would have benefited the child. He never said that her – he indicated that there may have benefits that the child may have received if steroids and tocolytics had been administered. But as I just said a moment ago, steroids and tocolytics – the administration of steroids and tocolytics were not the standard of care in the presence of a leaking bag of waters, which is uncontradicted, was present. Furthermore, Dr. Shiffrin did not indicate that the injuries that Lauren Lageste incurred were approximately caused by the failure to administer steroids or tocolytics. The causation testimony in the record is that by Dr. Gabriel, who said her injuries were approximately caused by the lack of oxygen and then by head entrapment during delivery. So based upon that, the only causation testimony is as to incidents during injury, and he didn't – during delivery he didn't have anything to do with steroids and tocolytics. Finally, touching on jurisdiction and my preparation for this appeal, I noticed that unfortunately there had not been 304A language that appeared in any of the orders entered by the trial court before appeal was taken by the plaintiff. So that is an obvious barrier for this court to go forward. I did speak with plaintiff's counsel, as he indicated, and discussed the issue with him. I don't believe either of us were able to find any 304A language. So this case is – And if it turns out that's correct, that you can just file a statement that both of you have discussed, because that would maybe – Oh, yeah, we'll just – The situation would have been in there. You don't have to wait the seven days and the seven days and seven – Right. I think he's still looking at the issue, because it was two days ago, as he said. No, I understand. And we'll go from there. But otherwise, we would appreciate your – the earlier – I fully understand. Thank you, Your Honors. If there's nothing further, thank you. Mr. Dunn. Just a couple points. Just so the Court's aware, if that is the case, the plaintiff can go back and get 304A language and then have everything adopted if that's – should the Court desire that, so that we won't have to go through the briefing and the argument again. Just a couple points, Your Honor. There was no informed consent discussion after the fetal distress began. There's nothing in the medical records to indicate that once at 215, that when the first signs of fetal distress began, which is about 18 hours into – after she was admitted to the University of Chicago, no informed consent discussions about should there be a C-section or not at that point. The issue with the residents, what really hurt us was that the jury was never instructed that the University of Chicago could be held liable based on the conduct of the residents. At the end of the day, the jury could not have ever found the University of Chicago liable by their conduct. And so the judge removed them from the case in motion luminae, directed them out, and then never instructed the jury. So that killed us on the informed consent argument. The last point I'll make is that the steroids and rhododendron not being the standard of care, they administered them. I mean, their argument that it wasn't the standard of care is a lie by their own conduct. They had administered the rhododendron, and they had given the steroids. So we certainly think there was a basis for the judge to have provided that – or allowed us to provide that evidence to the jury. So if there's no further questions, I thank the Court and ask the Court to reverse. Thanks. Thank you very much. Appreciate the briefs, and we'll wait and see what happens on the 304. Thank you very much. Thank you.